**Electronically Filed
Intermediate Court of Appeals
CAAP-13-0002347
26-JUN-2017
07:57 AM**

NOS. CAAP-13-002347, CAAP-13-0002752 and
CAAP-13-0003040

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI

**No. CAAP-13-0002347**
RICHARD MISSLER and PATRICIA MISSLER,
Appellants-Appellees,
v.
BOARD OF APPEALS OF THE COUNTY OF HAWAIʻI; B.J. LEITHEAD-TODD,
Planning Director, Department of Planning, County of Hawaiʻi,
Appellees-Appellants,
and
MALAMA INVESTMENTS LLC, a Hawaiʻi limited liability company;
LOREN SAXTON and MARY SAXTON, Co-Trustees of the
Saxton Trust dated March 17, 2005, Appellees-Appellees

and

**No. CAAP-13-0002752**
RICHARD MISSLER and PATRICIA MISSLER,
Appellants-Appellees,
v.
B.J. LEITHEAD-TODD, Appellee-Appellant,
and
BOARD OF APPEALS OF THE COUNTY OF HAWAIʻI,
MALAMA INVESTMENTS LLC, a Hawaiʻi limited
liability company; LOREN SAXTON and MARY SAXTON,
Co-Trustees of the Saxton Trust dated March 17, 2005,
Appellees-Appellees

and

No. CAAP-13-0003040

RICHARD MISSLER and PATRICIA MISSLER,
Appellants-Appellants,
v.
BOARD OF APPEALS OF THE COUNTY OF HAWAI'I,
MALAMA INVESTMENTS LLC, a Hawai'i limited
liability company; LOREN SAXTON and MARY
SAXTON, Co-Trustees of the Saxton Trust dated
March 17, 2005; and PLANNING DIRECTOR,
DEPARTMENT OF PLANNING, COUNTY OF HAWAI'I,
Appellees-Appellees


APPEAL FROM THE CIRCUIT COURT OF THE THIRD CIRCUIT
(CIVIL NO. 12-1-449K)


MEMORANDUM OPINION
(By: Nakamura, C.J., Fujise and Ginoza, JJ.)

In these consolidated appeals, Appellees-Appellants
Board of Appeals for the County of Hawai'i (**BOA**) and Michael
Yee,[1] Planning Director, Department of Planning, County of
Hawai'i (**Planning Director**) (collectively, **the County**) appeal
from the (1) Judgment, filed on June 27, 2013, and (2) "Order
Granting in Part and Denying in Part Appellants' Motion for
Taxation of Attorney's Fees and Costs [Filed May 30, 2013]"
(**Order Granting in Part and Denying in Part Attorney's Fees and
Costs**), filed on July 25, 2013, in the Circuit Court of the Third
Circuit (**circuit court**).[2]

Richard Missler and Patricia Missler (**the Misslers**)
appeal from the Order Granting in Part and Denying in Part
Attorney's Fees and Costs.

The County contends the circuit court erred when it:

(1) concluded that a planned unit development (**PUD**)
permit issued to Riehm Owensby Planners Architects was invalid
because the County did not comply with the County of Hawai'i

---

[1] Pursuant to Hawai'i Rules of Appellate Procedure Rule 43(c)(1),
Michael Yee, as Planning Director, is automatically substituted for B.J.
Leithead-Todd.

[2] The Honorable Ronald Ibarra presided.

2

General Plan (**General Plan**) and the Kona Community Development Plan (**Kona CDP**); (2) concluded the PUD permit was invalid because it did not contain specific measures which required the lots to be used for agricultural uses; (3) concluded the PUD permit was invalid because the County did not review the PUD application pursuant to their constitutional duties under the public trust doctrine; and (4) granted attorney's fees to the Misslers under the private attorney general doctrine.

The Misslers are owners of property adjacent to the land subject to the PUD application in this case. They contend the circuit court abused its discretion when it failed to award attorney's fees and costs incurred: (1) at the administrative level of the case against the Planning Director and Malama Investments, LLC (**Malama**) and Loren Saxton and Mary Saxton (**the Saxtons**) (collectively, **the Applicants**); and (2) at the trial level against the BOA and the Applicants.[3]

For the reasons set forth below, we affirm in part and vacate in part.

---

[3] In their answering brief, the Misslers also contend that the BOA does not have standing to bring this appeal. We disagree.

Hawai'i Rules of Civil Procedure (**HRCP**) Rule 72(a) provides that in an appeal to the circuit court from an order or action of a governmental official or body, an "'appellee' means every governmental body or official (other than a court) whose decision, order or action is appealed from, and every other party to the proceedings." Thus, the BOA became a party to this case at the circuit court when the Misslers appealed from the BOA Decision and Order to the circuit court.

In Fasi v. State Public Employment Relations Board, 60 Haw. 436, 591 P.2d 113 (1979), the Supreme Court of Hawai'i stated that an administrative board may appeal from an order rendered in judicial review of the board's order, if the board is an aggrieved party. Id. at 441, 591 P.2d at 116. The administrative board is an aggrieved party "where the effect of the judgment is to overturn a decision of the board with respect to the implementation of legislation entrusted to the board for administration." Id. at 442, 591 P.2d at 117. The Hawai'i County Charter states that the BOA, inter alia, hears and determines appeals from final decisions of the planning director and is part of the Planning Department for administrative purposes. Haw. Cty. Charter § 6-9.2 (2014). Thus, as part of the Planning Department, the BOA acts to review the Planning Director's implementation of the Hawai'i County Code, and in this case whether a PUD permit was appropriate. Therefore, the BOA has standing to bring an appeal from the circuit court's decision.

## I.   Background

The PUD[4] application in this case concerns a property located in South Kona, Hawai'i, called Waikāku'u Ranch (**the property**).  The property consists of 72.178 acres and is zoned Agricultural A-5a (requiring a minimum site area of five acres of land).[5]  The PUD application states the proposed PUD consists of fourteen lots, one lot to be plus or minus 40.14 acres and the rest of the lots to be plus or minus two acres in size.  The application also requests several variances, one of which is from Section 25-5-74 of the Hawai'i County Code,[6] requesting a variance from the minimum building site area of five acres to allow lots two through fourteen to be two or more acres in size.

In a letter dated September 14, 2011, the County of Hawai'i Planning Department (**Planning Department**) approved the PUD application "to allow the development of a master-planned community of 13 lots and 1 bulk lot of approximately 40.14 acres."  The Planning Department found, *inter alia*, that the proposed agricultural lots were consistent with the General Plan and the PUD application was consistent with the spirit of the Kona CDP.

On October 13, 2011, the Misslers appealed to the BOA from the Planning Department's approval of the PUD permit,

---

[4]  At the time of this case, Section 25-6-1 of the Hawai'i County Code provided:

> **Section 25-6-1.   Purpose.**
> The purpose of planned unit development (P.U.D.) is to encourage comprehensive site planning that adapts the design of development to the land, by allowing diversification in the relationships of various uses, buildings, structures, open spaces and yards, building heights, and lot sizes in planned building groups, while still insuring that the intent of this chapter is observed.

[5]  See HCC § 25-5-71 ("Designation of A districts.  Each A (agricultural) district shall be designated on the zoning map by the symbol 'A' followed by a number together with the lower case letter 'a' which indicates the required or minimum number of acres for each building site.  For example, A-10a means an agricultural district with a minimum site area of ten acres.").

[6]  Hawai'i County Code § 25-5-74 provides: "The minimum building site area in the A district shall be five acres."

4

requesting that the BOA reverse the Planning Director's decision granting the PUD.

After several hearings before the BOA, on August 10, 2012, the BOA filed its Findings of Fact, Conclusions of Law, and Decision and Order (**BOA Decision and Order**). The BOA concluded, *inter alia*, that the PUD application was complete and the Kona CDP does not apply to the processing of a PUD application. The BOA denied the Misslers' appeal and ordered all parties to bear their own fees and costs incurred in the proceeding.

On August 24, 2012, pursuant to Hawaii Revised Statutes (**HRS**) § 91-14 (2012) the Misslers appealed to the circuit court from the BOA Decision and Order.

On April 25, 2013, the circuit court filed its Findings of Fact, Conclusions of Law and Decision and Order (**Circuit Court Decision and Order**), which concluded, *inter alia*, that:

a. The permit is not valid because the Director and BOA did not comply with the General Plan and KCDP. The Director and the BOA violated HRS § 91-14(g)(1) and (4).
b. The permit is not valid because the Director and BOA did not review the PUD application pursuant to their constitutional duties and responsibilities with regard to the public natural resources trust. The Director and the BOA violated HRS § 91-14(g)(1), (4) and (5).
c. The permit is not valid because it does not contain specific measures that require project lots to be used for bona fide agricultural uses. The Director and the BOA violated HRS § 91-14(g)(1) and (4).

The circuit court remanded the case for further proceedings consistent with the Circuit Court Decision and Order.

On May 20, 2013, the Misslers filed a motion requesting that the circuit court grant them attorney's fees and costs incurred both at the administrative level before the BOA and before the circuit court "because the agency appeal below and the judicial review constitute a single 'proceeding.'"

On June 26, 2013, the circuit court filed an "Order Clarifying Findings of Fact and Conclusions of Law and Decision and Order Filed April 25, 2013," which amended the last sentence of the Circuit Court Decision and Order to read:

IT IS HEREBY ORDERED that the August 10, 2012 decision of Appellee BOA is reversed because the substantial rights of

> Appellants have been prejudiced by the violations and errors described hereinabove. The Director's September 14, 2011 decision-letter is vacated and the matter is remanded to Appellee Planning Director, Department of Planning, County of Hawai'i to consider the PUD Application consistent with the analysis set forth in the Findings of Fact, Conclusions of Law and Decision and Order, pursuant to HRS § 91-14(g).

On June 27, 2013, the circuit court filed the Judgment.

On July 25, 2013, the circuit court filed its Order Granting in Part and Denying in Part Attorney's Fees and Costs, awarding attorney's fees and costs to the Misslers that were incurred at the circuit court, but not during the administrative proceedings, ruling that the Misslers met the three-prong test under the private attorney general doctrine. Although the Misslers requested attorney's fees and costs against the Planning Director, the BOA, and the Applicants, the circuit court awarded attorney's fees and costs only against the Planning Director.

## II. Standard of Review

### A. Secondary Appeals

> Review of a decision made by the circuit court upon its review of an agency's decision is a secondary appeal. The standard of review is one in which this court must determine whether the circuit court was right or wrong in its decision, applying the standards set forth in HRS § 91-14(g) to the agency's decision. This court's review is further qualified by the principle that the agency's decision carries a presumption of validity and appellant has the heavy burden of making a convincing showing that the decision is invalid because it is unjust and unreasonable in its consequences.

Curtis v. Bd. of Appeals, 90 Hawai'i 384, 392, 978 P.2d 822, 830 (1999) (citation omitted).

HRS § 91-14(g) (2012) provides:

> (g) Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:
> (1) In violation of constitutional or statutory provisions; or
> (2) In excess of the statutory authority or jurisdiction of the agency; or
> (3) Made upon unlawful procedure; or
> (4) Affected by other error of law; or
> (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(6)     Arbitrary, or capricious, or characterized by
        abuse of discretion or clearly unwarranted
        exercise of discretion.

**B.    Public Trust**

The public trust is a question of constitutional law, which requires the court to "'exercise its own independent judgment based on the facts of the case' under the right or wrong standard." Kauai Springs, Inc. v. Planning Comm'n, 133 Hawai'i 141, 165, 324 P.3d 951, 975 (2014) (citation and brackets omitted).

**C.    Private Attorney General Doctrine**

The court's determination as to the private attorney general doctrine is reviewed "under the abuse of discretion standard," however, "we review *de novo* whether the trial court disregarded rules or principles of law that arise in deciding whether or not a party satisfies the three factors of the private attorney general doctrine."

Asato v. Procurement Policy Bd., 132 Hawai'i 333, 357, 322 P.3d 228, 252 (2014) (citation omitted).

**III.  The County's Appeal**

**A.    The County Must Comply With the Kona CDP**

**1.    Relevant Provisions in the Kona CDP have the force and effect of law**

The County contends that the circuit court erred in its interpretation of the relationship between the General Plan and the Kona CDP, contending the Kona CDP is not part of the General Plan and only makes recommendations.

The circuit court concluded in pertinent part:

64. The Director must interpret, apply and enforce all ordinances, statutes, rules and other laws pertaining to planning and land use matters in the County, including the General Plan and KCDP, to fulfill the responsibilities as the Chief Planning Officer of the County. Hawai'i County Charter § 6-7.2(b).
65. The General Plan was adopted as an ordinance by the Hawai'i County Council on February 2, 2005. Ordinance No. 05 25. See also, County of Hawai'i Charter § 3-15.
66. The KCDP was adopted as an ordinance by the Hawai'i County Council on September 25, 2008.
67. A community development plan is a part of the general plan and implements the general plan. GATRI v. Blane, 88 Hawai'i 108, 114, 962 P.2d 367, 373 (1998).
68. Conformance to the 2005 General Plan, of which the KCDP is a part, is a decision criterion under Section

25-6-10(b) of the County Zoning Code and [County of Hawaiʻi Planning Department Rules of Practice and Procedure Rule] 7-7(a)(2). An application must contain an "analysis" of the general plan and community development plan as required by Section 25-6-3(2)(E) of the County Zoning Code. The petition must also include how the proposed development substantially conforms to the General Plan. Department Rule 7-4(b)(2)(D).

. . . .

75. Sixth, the BOA may not nullify an ordinance that it is charged to administer. HOH Corp. v. Motor Vehicle Industry Licensing Board, 69 Haw. 135, 141, 736 P.2d 1271, 1275 (1987.

76. When the County Council enacted the 2005 General Plan Ordinance 05-25, the council stated in Section 15.1 of the 2005 General Plan Ordinance that a community development plan "may contain ... detailed land use and zoning guide maps ... architectural design guidelines, planning for watersheds ... and any other matters relating to the planning area." Section 15.1, Page 1, 2005 General Plan Ordinance.

In GATRI v. Blane, 88 Hawaiʻi 108, 962 P.2d 367 (1998), the Supreme Court of Hawaiʻi concluded, inter alia, that the Kihei-Mākena Community Plan, on the island of Maui had the force and effect of law. Id. at 115, 962 P.2d at 374. The applicant, GATRI, applied to the Department of Planning of the County of Maui for a Special Management Area (**SMA**) permit pursuant to HRS § 205A-26(2)(C), and the statute required, inter alia, that the proposed development be consistent with both the county general plan and zoning. Id. at 113, 962 P.2d at 372. The supreme court held that the general plan had the force and effect of law "insofar as the [SMA] statute requires that a development within the SMA must be consistent with the general plan." Id. at 114, 962 P.2d at 373.

With regard to the Kihei-Mākena Community Plan the supreme court noted that it provided a "relatively detailed scheme for implementing the [General Plan]" as opposed to "broad, hortatory policy statements." Id. at 114-15, 962 P.2d at 373-74. The supreme court also concluded that the Kihei-Mākena Community Plan had the force and effect of law because (1) it was adopted after extensive public input and enacted into law by the Maui County Council; and (2) the Maui County Code explicitly states that community plans adopted by the County Council are part of the general plan. Id. at 113, 115, 962 P.2d at 372, 374.

At the relevant time in the instant case, the Hawai'i County Code required a PUD permit to include an "analysis of the relationship of the proposed development to the general plan," but did not specifically mention community development plans.[7] HCC § 25-6-3(2)(E). Further, unlike in GATRI, the Hawai'i County Code does not explicitly state that community development plans are part of the General Plan. However, upon a review of the section in the General Plan addressing community development plans, it appears that community development plans are intended to be part of the General Plan.

Chapter 15 of the Hawai'i County General Plan, entitled "Plan Implementation," provides: "The General Plan sets forth broad goals, objectives, and policies. Implementation requires translating these broad statements to specific actions, systematically evaluating progress, and active community participation. In this regard, follow-up planning efforts will involve the preparation of Community Development Plans, Capital Improvements Program, and an annual report." Haw. Cty. Gen. Plan Chapter 15 at 15-1 (emphasis added). In addition, section 15.1 of the General Plan identifies the purpose of a community development plan, stating in pertinent part:

> The Community Development Plans are intended to be the forum for community input into managing growth and coordinating the delivery of government services to the community. The Community Development Plans will translate the broad General Plan statements to specific actions as they apply to specific geographical areas.
>
> A Community Development Plan should direct physical development and public improvements within a specific area. The Community development Plan may contain detailed land use and zoning guide maps, plans for roadways, drainage, parks, and other infrastructure and public facilities, architectural design guidelines, planning for watersheds and other natural features, and any other matters relating to the planning area.

---

[7] It appears that in 2015, Hawai'i County Code § 25-6-3(2)(E) was amended to provide that a PUD permit shall be accompanied by "[a]n analysis of the relationship of the proposed development to the general plan, any adopted community development plan, other adopted master plan, and if applicable, any other adopted design guidelines and/or standards affecting the project area." (Emphasis added.)

Id. (emphasis added). Thus, based on the language in the General Plan, a community development plan implements the General Plan with specific actions applicable to specific geographic areas.

Like the community development plan in GATRI, Hawaiʻi County Code § 16-2 (Bill 333), effective September 25, 2008, adopted and incorporated by reference the Kona CDP as an ordinance. The Kona CDP contains a "detailed scheme" for implementing the General Plan, and states that its purposes are to:

- Articulate Kona's residents' vision for the planning area;
- Guide regional development in accordance with that vision, accommodating future growth while preserving valued assets;
- Provide a feasible infrastructure financing plan to improve existing deficiencies and proactively support the needs of future growth;
- Direct growth to appropriate areas;
- Create a plan of action where government and the people work in partnership to improve the quality of life in Kona for those who live, work, and visit;
- Provide a framework for monitoring the progress and effectiveness of the plan and to make changes and update it, if necessary.

Kona CDP § 1.2.

Chapter 4 of the Kona CDP is entitled "Goals, Objectives, Policies, and Actions" and contains eight elements meant generally to correspond with similar elements (some combined) in the General Plan: 1. Transportation, 2. Land Use, 3. Environmental Resources, 4. Cultural Resources, 5. Housing, 6. Public Facilities, Infrastructure and Services, 7. Energy, and 8. Economic Development. Kona CDP Chapter 4 at 4-1. Chapter 4 provides that each element has components, including "goals," "objectives," "policies," and "actions." As to policies and actions, Chapter 4 states:

> 6. Policies, that prescribe how each objective will be achieved. The policies that use the word "shall" are mandatory directives legally binding on County agencies. Among the most significant legally binding policies are those presented in Section 4.2 Land Use. These policies must be implemented through land use decisions and development permits issued after the KCDP is adopted. Such policies, however, would not be retroactive to prior decision-making and existing zoning. Some mandatory policies require

10

balancing with other policies, particularly those that require County funding. Some policies create special provisions that differ from the County Code; these Code-amending policies are summarized and noted as "enacted by plan" in Section 5.3. <u>Other policies that use the word "should" are not legally binding as they recommend desired actions especially those affecting agencies over which the plan does not have authority (e.g. State agencies, utilities, non-profits)</u>. Each policy is identified by the alpha-numeric code for its corresponding objective, followed by a decimal and its numeric sequence. For example, "Policy TRAN-3.2" is the second policy of the third objective in the Transportation Element.

7. Actions, that specify how the policy will be implemented. An action may be a precursor to implementing a policy or may specify what is required or recommended to implement it. The list of actions are meant to be refined during the process of implementation in consideration of available resources, more detailed analysis, feasibility, and other factors. <u>Thus, these actions are not legally binding but are meant to be implemented in good faith</u>.

Kona CDP Chapter 4 at 4-2 (emphasis added). Thus, the Kona CDP recognizes that some of its provisions are recommendations and some are legally binding on County agencies, and specifically points to the policies in section 4.2, Land Use, as the "most significant legally binding policies."[8] Policies which include the designation "LU" are in section 4.2, Land Use.

In their appeal before the BOA, the Misslers specifically challenged that the PUD permit did not comply with Policy LU-3.3, Policy LU-3.4, Attachment "C" Clustered Rural Subdivision Guidelines, and Policy ENV-1.5 in the Kona CDP.

Policy LU-3.3 in the Kona CDP is entitled "Clustered Rural Subdivision Project Unit Development (PUD)"[9] and states:

Provided a PUD application for rural- or <u>agriculturally-zoned land</u> substantially meets the Clustered

---

[8] In a letter written to several Community Development Plan Steering Committee members, the Planning Department stated that the regulatory effect of a community development plan is to "guide, and in some cases mandate, how other regulatory programs are handled." The letter also states that the actual effects of enacting a community development plan by ordinance "depends upon the specific wording or the provisions of the CDP and upon the type of follow-up action."

[9] Chapter 25, Article 6 of the Hawaiʻi County Code outlines the regulations for a "Planned Unit Development (PUD)." Although the Kona CDP sometimes refers to a PUD as a "<u>Project</u> Unit Development (PUD)" (emphasis added), it appears from the references in the Kona CDP to Chapter 25 of the Hawaiʻi County Code that a "Project Unit Development" is meant to be a "Planned Unit Development."

> Rural Subdivision Guidelines in Attachment C, the Planning
> Director <u>shall</u> issue approval, with or without conditions
> within sixty (60) days after acceptance of the application,
> and the approval <u>shall</u> be considered a tentative subdivision
> approval. All other requirements and procedures of a PUD
> <u>shall</u> be as set forth in Article 6 of the Zoning Code.

Kona CDP § 4.2.3 at 4-48 (emphasis added). Following Policy LU-3.3, Action LU-3.3a states it: "Amends Chapter 25 Zoning Code and Chapter 23 Subdivision Code to establish Clustered Rural Subdivision PUD (Enacted by plan)." <u>Id.</u> Thus, the Kona CDP augments the Zoning Code and the Subdivision Code by adding requirements for PUD applications in rural or agriculturally zoned lands, requiring the application to substantially meet the Clustered Rural Subdivision Guidelines in Attachment C of the Kona CDP.

Policy LU-3.4, entitled "Clustered Rural Subdivision Guidelines," provides:

> The Clustered Rural Subdivision Guidelines in Attachment C
> apply to proposed subdivisions outside of the Kona Urban
> Area (UA).[10] The intent of the guidelines is to minimize
> grading, preserve the natural appearance of the land to the
> maximum extent possible, ensure agriculture use in the State
> Land Use Agricultural District, and create a rural setting
> for residences. Towards this end, the guidelines <u>shall</u>, at a
> minimum, specify:
> 1.    Minimum lot sizes;
> 2.    Natural and cultural resources meriting protection and
>       associated buffer areas, as applicable;
> 3.    Minimum standards for roads and wastewater disposal;
> 4.    Legal tools for permanent protection, maintenance of
>       open space, and/or agricultural lands;
> 5.    Connections to the open spaces of surrounding areas.

<u>Id.</u> (emphasis added.)

Attachment C to the Kona CDP, entitled "Clustered Rural Subdivision Guidelines," provides that its purpose is to

> provide a flexible procedure to identify and preserve open
> space while maintaining the existing density of residential
> units for the overall site area. "Neutral density" is
> achieved by allowing smaller individual owned residential
> lots that include or are adjacent to aesthetically and
> ecologically important areas. Individually owned residential
> lots and the importance of preserving rural open space is as
> follows:

---

[10]  The parties do not dispute that the property associated with the PUD application in this case is outside the Kona Urban Area.

> A.     Protection of significant ecological, cultural, scenic, recreational, and agricultural areas in perpetuity;
>
> B.     Prevention of flooding, erosion, and water pollution, and protecting the quality and quantity of drinking water;
>
> C.     Promoting a more compact form of development.

Kona CDP Attachment C at 1.  Attachment C further states:

> These Guidelines apply to a special type of "Planned Unit Development" (PUD) for North and South Kona for lands outside the Urban Area zoned Agricultural, Intensive Agricultural, Family Agricultural, or Rural-Agricultural. The guidelines supplement the requirements and procedures for PUDs and subdivisions set forth in the Zoning Code, Subdivision Code, and Planning Department Rules.

Id. (emphasis added.)  Attachment C also details a process to follow when applying for a clustered rural subdivision.

Finally, Policy ENV-1.5, entitled "Sensitive Resources," provides in pertinent part:

> In the context of Kona's ecology and history, the following natural and cultural resources shall be considered sensitive and therefore shall be inventoried, as part of any permit application to the County Planning Department (see Figures 4-8a to 4-8d):
> - Critical habitat areas as identified by the U.S. Fish & Wildlife or County General Plan;[11]
> - Predominantly native ecosystems, which may not be considered endangered but are valued because of their nearly pristine condition;[12]

---

[11]  In a letter dated February 2, 2012 and addressed to Council member Brittany Smart, Paul J. Conry an Administrator with the State of Hawai'i Department of Land and Natural Resources wrote that the property involved in this case

> is characterized by habitat that is known to be used by the Hawaiian hoary bat and the Hawaiian hawk for breeding, foraging, and roosting. In addition, we note that records of endangered plants such as loulu palm (Pritchardia spp.) are known from the area, indicating that listed plants may potentially exist within the subject parcel. Activities that include the cutting or clearing of vegetation in forests that support those species have the potential to result in take of listed species.
>
> Based on the above considerations, we recommend that biological surveys (to include plants and animals) be conducted for the project area, or that the applicant schedule a meeting with our staff to consult on any potential impacts of this project on protected resources and to determine [sic].

[12]  Several letters from community members were submitted to the BOA indicating that the upper portion of the property contained a pristine 'ōhi'a forest.  In her testimony before the BOA the Planning Director testified that

(continued...)

> . . .
>
> ■    High-level groundwater recharge area which shall
>      initially be defined as all lands mauka[13] of the
>      1,500 foot elevation and which may be refined by the
>      Kona Mauka Watershed Management Program;[14]
>
> . . .
>
> Any permit application that encompasses any of the above
> resources shall strive to incorporate these resources as
> assets. If a proposed project will have significant,
> unavoidable, adverse impacts to any of the above resources,
> the presumption shall be denial of the application and the
> applicant will have the burden of explaining any overriding
> considerations.

Kona CDP § 4.3.3 at 4-58 (emphasis added).

The above provisions of the Kona CDP provide a detailed scheme for implementing the General Plan. Further, because the Kona CDP was adopted pursuant to the General Plan and Hawai'i County Code § 16-2 (Bill 333) adopts and incorporates by reference the Kona CDP as an ordinance, the provisions indicated in the Kona CDP to be legally binding on County agencies hold the force of law.

The County argues, however, that by adopting the Kona CDP the County was not adopting law, but only recommendations. We disagree. Rather, we agree with the circuit court when it concluded:

> The BOA's narrow interpretation of Section 15.1 [of the
> General Plan] would limit the County Council's legislative
> power and would restrict the council to "recommending" to
> itself that the council (or a future council) enact at some
> future date amendments or supplements to various land use
> regulations even though the council already has that present
> authority and ability to enact such amendments or
> supplements.

---

[12] (...continued)
the Planning Department was not required to include information in the PUD approval describing the property as an old 'ōhi'a forest based on letters received from community members.

[13] Mauka is defined as "inland." Mary Kawena Pukui & Samuel H. Elbert, Hawaiian Dictionary (6th ed. 1986).

[14] A letter from Jason K. Knable, representing the Applicants, to Deanne Bugado, a planner with the Department of Planning, states that "[a]ll of the farm dwellings developed within this PUD, in addition to any farm dwellings developed on the large makai bulk lot, will be located above the 1,640 foot elevation[.]"

Therefore, the PUD application in this case must comply with the legally binding provisions of the Kona CDP, which include Policy LU-3.3, Policy LU-3.4, Attachment "C" Clustered Rural Subdivision Guidelines, and Policy ENV-1.5.

### 2.    The title of Bill 333 was adequate

The County contends that amendments to the Zoning Code and the Subdivision Code included in the Kona CDP land use section specifically addressing PUD permits are invalid, because the title of Ordinance No. 08 131 (Bill 333), "An Ordinance Adopting the County of Hawai'i Kona Community Development Plan," does not mention these amendments.

With regard to Bill 333, the circuit court concluded:

> 81. The BOA's ruling on Bill 333's title is wrong. The title of Bill 333 reads "An Ordinance Adopting the County of Hawai'i Kona Community Development Plan."
> 82. Since a community development plan may contain "regulatory measures" such as Policy ENV-1.5, Policy LU-3.3, Policy [LU-]3.4 and Attachment "C," Bill 333's title is adequate. In Re Application of Tom Pong, 17 Haw. 566, 570, 572-575 (1906); Schwab v. Ariyoshi, 58 Haw. 25, 33-35, 564 P.2d 135, 140-141 (1977) (bill title sufficient if the bill's subjects are "connected with or related to each other" and are "parts of, or germane to, one general subject").
> 83. The BOA's determination that the KCDP Ordinance does not mention Chapters 23 and 25 of the Zoning Code is wrong. The KCDP Ordinance states on its face (at Page 4-48, Policy LU-3.3a), that the County Council "Amends Chapter 25 Zoning Code and Chapter 23 Subdivision Code to establish Clustered Rural Subdivision PUD (Enacted by plan)."

(Footnote omitted.)

The Hawai'i County Charter provides: "Every ordinance of the council shall embrace but one subject, which subject shall be expressed in its title. If an ordinance embraces a subject not expressed in its title, only that subject shall be void." Haw. Cty. Charter § 3-10(b).

The Hawai'i Supreme court has stated:

> The term 'subject,' as used in the [state] constitution is to be given a broad and extended meaning, so as to allow the legislature full scope to include in one act all matters having a logical or natural connection. To constitute duplicity of subject, an act must embrace two or more dissimilar and discordant subjects that by no fair intendment can be considered as having any legitimate connection with or relation to each other. All that is necessary is that act should embrace some one general

15

> subject; and by this is meant, merely, that all matters treated of should fall under some one general idea, be so connected with or related to each other, either logically or in popular understanding, as to be parts of, or germane to, one general subject.

Schwab v. Ariyoshi, 58 Haw. 25, 33, 564 P.2d 135, 140 (1977).

In this case, the title to Bill 333, "An Ordinance Adopting the County of Hawai'i Kona Community Development Plan," embraces the subject expressed in its title. Although the Kona CDP addresses several topics including transportation, development, and the environment, all of the topics embrace the general goal of a community development plan to "translate the broad General Plan statements to specific actions as they apply to specific geographic areas." Haw. Cty. Gen. Plan § 15.1 at 15-1. In addition, the General Plan provides that "Community Development Plans shall recommend amendments as appropriate to the codes[.]" Id. at 15-2. Thus, it is within the scope of the title that the ordinance could contain amendments to specific provisions of the Hawai'i County Code.

Therefore, the title of Ordinance No. 08 131, "An Ordinance Adopting the County of Hawai'i Kona Community Development Plan," does not violate the requirement under Hawai'i County Charter § 3-10(b) for a sufficient title.

### 3. The alleged "grandfather clause" contained in the Kona CDP does not preclude application of the Kona CDP to PUD permits

The County contends that the Kona CDP Land Use section 4.2.2 contains a "grandfather clause," which precludes application of the Kona CDP to the PUD permit application in this case and that the circuit court mischaracterized the legal effect of the Kona CDP's grandfather clause.

The circuit court concluded:

> 84. The BOA also erroneously construed the KCDP Ordinance's substantive provisions in question as being inapplicable to a planned unit development.
>
> . . . .
>
> 86. In reaching its erroneous conclusion, the BOA relied upon the KCDP Ordinance's "grandfather clause" that

16

protects existing entitlements, but that also makes clear that landowners with such pre-existing entitlements must still comply with the substantive provisions of the KCDP Ordinance if the landowners were to apply for "new changes of zone, time extensions on existing zoning requiring County Council action, state land use boundary amendments, and Special Management Area (SMA) permits, when applicable."

87. More importantly, the "grandfather clause" does not exempt the Applicants or the Property from the KCDP Ordinance's substantive provisions governing a planned unit development.

.    .    .    .

90. In its August 10, 2012 decision, the BOA erred in statutory interpretation by exempting the PUD application under the "grandfather clause," and when it concluded that the KCDP Ordinance's substantive provisions in question, viz., Policy ENV-1.5, Policy LU-3.3, Policy 3.4 and Attachment "C" could not be enforced or applied.

(Citations omitted.)

Within the Land Use portion of the Kona CDP, Section 4.2.2 is entitled "Overall Strategy" and contains the language relied upon by the County:

The legally binding policies in this section, as defined in 4.0 Goals, Objectives, Policies and Actions, do not override or invalidate existing zoning. Such legally binding policies, however, shall be implemented with new changes of zone, time extensions on existing zoning requiring County Council action, state land use boundary amendments, and Special Management Area (SMA) permits, when applicable. Where such policies modify subdivision standards and requirements, they would only apply to subdivision applications received after the effective date of the ordinance enacting the Kona CDP. Variances to policies modifying subdivision standards and requirements may be applied for in accordance with the standards and procedures set forth in the Subdivision Code.

Kona CDP § 4.2.2 at 4-32.  The County focuses on the language that states, "[s]uch legally binding policies, however, shall be implemented with new changes of zone, time extensions on existing zoning requiring County Council action, state land use boundary amendments, and Special Management Area (SMA) permits, when applicable."  The County contends that "[b]y the plain language of the KCDP, the policies of the land use element of the KCDP do not apply to this particular PUD permit as it does not involve any change of zoning, state land use boundary amendment or SMA permit."

17

In our view, the County focuses on the wrong sentence. Rather, the relevant sentence is the one that follows and states: "[w]here such policies modify subdivision standards and requirements, they would only apply to subdivision applications received after the effective date of the ordinance enacting the Kona CDP." By its own terms, the Kona CDP creates Clustered Rural Subdivision Guidelines for PUD applications, which apply to "proposed subdivisions outside the Kona Urban Area." Kona CDP § 4.2.3 at 4-48. Further, the Clustered Rural Subdivision Guidelines "supplement the requirements and procedures for PUDs and subdivisions set forth in the Zoning Code, Subdivision Code, and Planning Department Rules." Kona CDP Attachment C, at 1.

Here, the Kona CDP was enacted as an ordinance in 2008 and the PUD application was submitted in 2010, after the Kona CDP's enactment, and thus the Kona CDP applies to the PUD application in this case.

**B.    The PUD Application Does Not Comply With the Hawai'i County Code**

The County contends that the circuit court erred when it concluded that the PUD permit was invalid because it did not contain specific measures to ensure the lots would be used for agricultural purposes.

The BOA made the following finding: "[i]nasmuch as the proposed Project will establish agricultural lots that are consistent with permitted density allowed by zoning, the development of the Project will remain consistent with agricultural uses that prevail within the surrounding area."

By contrast, the circuit court concluded:

> 104. Appellants also argue that the PUD permit is not valid because it does not contain specific measures that require project lots to be used for bona fide agricultural uses.
> 105. The BOA found that the Project would establish agricultural lots consistent with permitted density allowed by zoning and consistent with agricultural uses that prevail in the surrounding area.
> 106. According to the application, each of the thirteen 2-acre lots would support a "farm dwelling," the design for which will be "governed by the [Covenants, Conditions, and Restrictions (CC&R's)]." However, the

18

> CC&R's (as well as any drawings of the proposed structures)
> do not appear in the application as required by Section
> 25-6-3(3)(A) of the County Zoning Code.
>     107. The application does not contain an agricultural
> plan as part of the "comprehensive site plan" and "general
> development plan covering the entire area" as required by
> Sections 25-6-1 and 25-6-3(3) of the County Zoning Code.
>
> . . . .
>
>     109. The Director's decision contravenes Sections
> 25-6-1 and 25-6-3(3)(A) and thus is in violation of
> statutory provisions.

(Emphasis added, citations omitted.) The circuit court further concluded the "permit is not valid because it does not contain specific measures that require project lots to be used for bona fide agricultural uses."

The circuit court concluded that the PUD application did not comply with Hawai'i County Code § 25-6-3(3)(A), which requires that a PUD application contain: "Drawings and plans comprising a general development plan covering the entire area of the P.U.D., and providing the following information: (A) Uses, dimensions, and locations of proposed structures[.]"[15] HCC § 25-6-3(3)(A).

The PUD application states that each of the proposed fourteen plots will have a farm dwelling. The PUD application does not contain uses, dimensions, and locations of the proposed farm dwelling structures as required under Hawai'i County Code § 25-6-3-(3)(A). Therefore, we agree with the circuit court that the PUD application does not comply in this regard with the requirements of the Hawai'i County Code.

However, contrary to the circuit court's conclusion, Hawai'i County Code §§ 25-6-1 and 25-6-3(3) do not contain language requiring an "agricultural plan." Thus, this aspect of the circuit court's ruling was in error. Further, as to the

---

[15] Hawai'i County Code § 25-1-5 defines "structure" as: "anything above existing grade constructed or erected with a fixed location on the ground, or requiring a fixed location on the ground, or attached to something having or requiring a fixed location on the ground. The term 'structure' includes the term 'building.'" "Building" is defined as: "any structure used or intended for supporting or sheltering any use or occupancy."

circuit court's conclusion that the permit should have contained specific measures requiring project lots to be used for agricultural purposes, there likewise do not appear to be specific requirements in the Hawai'i County Code, the General Plan, or the Kona CDP for PUD permits to contain such requirements. Thus, we do not agree with the circuit court's conclusion that "the permit is not valid because it does not contain specific measures that require project lots to be used for bona fide agricultural uses." (Emphasis added.) We note, however, that the applicable zoning of Agricultural A-5a for the property remains in place and the property must still comply with the statutorily required activities and permissible uses for an agricultural district. See HRS § 205-2 (Supp. 2008) ("Districting and classification of lands"); HRS § 205-4.5 (Supp. 2009) ("Permissible uses within the agricultural districts"); see also HRS § 205-12 (2001) (regarding enforcement by the appropriate county officer or agency).

Therefore, the circuit court was correct in ruling that the PUD application violated Hawai'i County Code § 25-6-3(3)(A) because the application does not contain uses, dimensions, and locations of the proposed structures. However, the circuit court erred when it held that the PUD application failed to include an agricultural plan, and when it ruled that the PUD permit was "not valid" because it did not contain specific measures requiring the project lots to be used for bona fide agricultural uses.

### C.    The County's public trust obligation

The County contends the circuit court erred when it concluded that the County did not properly consider its public trust obligation when it approved the PUD permit.

With regard to the public trust, the circuit court concluded in pertinent part:

> 26. According to the Hawai'i Constitution and sovereign reservation, the public trust doctrine "applies to all water resources without exception or distinction." In re Water Use Permit Applications ("Waiahole I"), 94 Hawai'i 97, 133, 9 P.3d 409, 445 (2000).

20

. . . .

37. Affirmative obligation to preserve the public natural resources trust according to law is among the responsibilities of the Director as an officer of the County.

. . . .

41. As was recognized by the majority of the Supreme Court in Wai'ola, "maximizing the water resource's social and economic benefits includes the protection of the resource in its natural state." [Kelly v. 1250 Oceanside, 111 Hawai'i 205, 223, 140 P.3d 985, 1003 (2006)] (citations and quotations omitted).

42. The County's duty to conserve and protect is clear. Id. at 225[,] 140 P.3d at 1005.

43. The Director may not defer decision-making action with regard to the public natural resources trust to another agency nor to a future date. The Director, as an officer of the County, has a constitutional duty to "conserve and protect Hawaii's natural beauty and all natural resources, including ... water," in her official decision-making. In deferring this responsibility, the Director's decision violated constitutional provisions.

. . . .

45. While a PUD permit may not be "a ground disturbing permit," this does not free the Director from her obligation to protect the public natural resources trust.

46. Appellees have not cited any authority to support their argument. Instead, the clear weight of authority requires the Director to consider the public natural resources trust without regard to the stage of the planning.

. . . .

54. The actions of Appellees failed to meet obligations and duties pursuant to the public natural resources trust and are in contravention of Appellees' duty under the Constitution, as further elucidated by the Hawai'i Supreme Court. See [Waiahole I], 94 [Hawai'i] at 143, 9 P.3d at 455.

(Some ellipses in original, footnotes omitted.)

Article XI, § 1, known as the public trust doctrine, of the Constitution of the State of Hawai'i provides:

For the benefit of present and future generations, the State and its political subdivisions shall conserve and protect Hawaii's natural beauty and all natural resources, including land, water, air, minerals and energy sources, and shall promote the development and utilization of these resources in a manner consistent with their conservation and in furtherance of the self-sufficiency of the State.

All public natural resources are held in trust by the State for the benefit of the people.

21

"The public trust doctrine applies to <u>all water resources</u> without exception or distinction." <u>Kauai Springs</u>, 133 Hawai'i at 172, 324 P.3d at 982 (citation and brackets omitted). The supreme court enumerated four recognized protected uses of water under the public trust doctrine: (1) "the maintenance of waters in their natural state"; (2) "domestic water use, in particular, protecting an adequate supply of drinking water"; (3) "the use of water in 'the exercise of Native Hawaiian and traditional and customary rights"; and (4) "the reservation of water enumerated by the State Water Code[.]" <u>Id.</u>

The supreme court also provided the duties and obligations of an agency under the public trust doctrine, including that "[a]n agency must take the initiative in considering, protecting, and advancing public rights in the resource <u>at every stage of the planning and decision-making process</u>." <u>Id.</u> at 173, 324 P.3d at 983 (emphasis added, citation omitted). In addition, the "agency measures the proposed use under a 'reasonable and beneficial use' standard, which requires examination of the proposed use in relation to other public and private uses" and "[t]he agency must apply a presumption in favor of public use, access, enjoyment, and resource protection." <u>Id.</u> (citations omitted).

The agency must also "place the burden on the applicant to justify the proposed water use in light of the trust purposes." <u>Id.</u> "If there is a reasonable allegation of harm to one of the uses protected by the public trust, then the applicant must demonstrate that there is no harm in fact or that any potential harm does not preclude a finding that the requested use is nevertheless reasonable and beneficial." <u>Id.</u> (citation omitted). The applicant: (1) "is obligated to demonstrate <u>affirmatively</u> that the proposed use will <u>not</u> affect a protected use"; (2) "must demonstrate the absence of a practicable alternative water source"; and (3) "if the impact is found to be reasonable and beneficial, then in light of the cumulative impact of existing and proposed diversions on trust purposes, . . . must

22

implement reasonable measures to mitigate this impact." Id. (citations, brackets and quotation marks omitted).

The County contends that it fulfilled its duty under the public trust doctrine when it reviewed the PUD permit in accordance with the criteria set forth in the Hawai'i County Code and when it sought review and comment of other agencies as to the effect of the permit on public natural resources. However, the County has duties under the public trust doctrine independent of the PUD permit requirements found in the Hawai'i County Code. See Kauai Springs, 133 Hawai'i at 177, 324 P.3d at 987 (stating "the Planning Commission also had duties under the public trust independent of the permit requirements"). The County was "duty-bound to place the burden on the applicant to justify the proposed water use in light of the trust purposes." Id. at 173, 324 P.3d at 983.

The PUD application proposes to divide the 72.178 acre parcel of land into fourteen smaller plots, each of which would support a farm-dwelling and an unknown agricultural pursuit with rain-water catchment tanks located on each parcel. Catchment tanks would also supply water for fire fighting purposes. Thus, the proposed development requires water for both domestic and agricultural use.

In addition to the uses for water proposed in the PUD application, written testimony was submitted to the BOA regarding the exercise of Native Hawaiian traditional and customary practices using fresh water from the Waikāku'u Ranch area. Walter Kahiwa (**Kahiwa**), submitted written testimony stating that "Waikāku'u is a major source of fresh water in the mauka and makai[16] sections of the ahupua'a"[17] and "[i]n the coastal area of

---

[16] Makai is defined as "ocean." Mary Kawena Pukui & Samuel H. Elbert, Hawaiian Dictionary (6th ed. 1986).

[17] Ahupua'a is defined as:

Land division usually extending from the uplands to the sea, so called because the boundary was marked by a heap (*ahu*) of
(continued...)

23

Waikāku'u, people [including Kahiwa himself] would collect ('*ku'u*') the fresh water at points where the fresh water pours into the sea through underwater caves." The testimony also states that the zone of mix where the fresh water meets the sea provides a special environment for certain sea weed and fish species to survive. The testimony also mentions water holes that are found in the area of Waikāku'u from which people would collect fresh water.

Richard Missler also testified in the contested case hearing before the BOA that there is a ravine on the property that runs mauka to makai. Missler testified that a portion of the proposed roadway in the PUD application crosses the ravine.

Brenda J. Ford, a council member on the Hawai'i County Council, sent a letter to the BOA stating:

> There is a section of the parcel 34 that has a large ravine through it. I estimate that one ravine section is 30-40 feet deep and at least 100-150 feet across. This ravine section is located in the area designated as the entrance for a road into the parcel. Any road through this section would require a substantial bridge to be built to county standards to access the other side of the ravine.
>
> This same ravine would carry tremendous quantities of water in a heavy rain, but unfortunately, the ravine is not listed on any floodplain maps because it is too far south (between the 96 and the 97 mile marker of the Māmalahoa Highway) of most of the houses to be considered for flood mapping. This ravine leads upward into the rain forest and narrows as it continues mauka. I requested an aerial photograph of the area from the floodplain manager, but the resolution is not sufficient to see the ravine(s) clearly. Also, the trees are so large that even if they grow from deep within the ravine, they provide cover sufficient to obstruct the aerial views.
>
> Apparently, the applicant wants to cluster the housing development in the upper section of the ravine, but the only way to do that is to fill the ravine(s) with dirt and rocks. This would be a flooding catastrophe in the making. Once the water is dammed behind such a fill, it is only a matter of time until the dammed water will breach the fill and create a mud and rock flow that may reach the highway and

---

[17](...continued)
> stones surmounted by an image of a pig (*pua'a*), or because a pig or other tribute was laid on the altar as tax to the chief. The landlord or owner of an *ahupua'a* might be a *konohiki*.

Mary Kawena Pukui & Samuel H. Elbert, <u>Hawaiian Dictionary</u> (6th ed. 1986).

potentially cross it. Such a massive mud and rock flow may
kill and bury any drivers on the highway that it encounters.

In this case, under the public trust doctrine, the
Applicants had the burden to justify the proposed water use for
the PUD project. The PUD application does not address the effect
of the proposed project on the water resources in the area. The
application also does not reference a ravine on the property or
what effect, if any, the project would have on the flow of water
through the ravine. Further, because the Applicants did not
analyze the impact of the project in this regard, the application
in turn does not propose any mitigation measures.

Therefore, the County did not fulfill its duty under
the public trust doctrine.

**D. The circuit court erred in granting attorney's fees and costs under the private attorney general doctrine**

The County contends the circuit court erred when it
awarded the Misslers fees and costs under the private attorney
general doctrine because no Hawai'i appellate court has applied
the private attorney general doctrine in a secondary appeal from
a contested case. The County alternatively contends that even if
the private attorney general doctrine applies, the Misslers did
not satisfy the three-prong test.

In reviewing an award of attorney's fees under the
private attorney general doctrine, the Hawai'i Supreme Court has
recognized that "[w]e retain the abuse of discretion standard,
noting however that we review de novo whether the trial court
disregarded rules or principles of law that arise in deciding
whether or not a party satisfies the three factors of the private
attorney general doctrine." Honolulu Constr. and Draying Co. v.
State, Dep't of Land & Nat. Res., 130 Hawai'i 306, 313, 310 P.3d
301, 308 (2013).

The Misslers requested that the circuit court award
attorney's fees and costs against the Planning Director, BOA, and
the Applicants, seeking fees and costs incurred at both the

administrative level before the BOA and the proceedings in the circuit court.  Based on the private attorney general doctrine, the circuit court awarded the Misslers attorney's fees and costs against the Planning Director only, and limited the award to fees and costs incurred in the Misslers' appeal to the circuit court. The circuit court denied fees and costs incurred in the proceeding before the BOA because the Misslers did not prevail at that level.

The private attorney general doctrine is an exception to the American Rule, which requires that "each party is responsible for paying his or her own litigation expenses." Sierra Club v. Dep't of Transp., 120 Hawai'i 181, 218, 202 P.3d 1226, 1263 (2009).  The private attorney general doctrine

> is an equitable rule that allows courts in their discretion to award attorneys' fees to plaintiffs who have vindicated important public rights. Courts applying this doctrine consider three basic factors: (1) the strength or societal importance of the public policy vindicated by the litigation, (2) the necessity for private enforcement and the magnitude of the resultant burden on the plaintiff, (3) the number of people standing to benefit from the decision.

Maui Tomorrow v. Bd. of Land & Nat. Res., 110 Hawai'i 234, 244, 131 P.3d 517, 527 (2006) (quoting In re Water Use Permit Applications, 96 Hawai'i 27, 29, 25 P.3d 802, 804 (2001) (Waiahole II)) (brackets omitted).

The first prong of the test requires the court to consider "the strength or societal importance of the public policy vindicated by the litigation." Maui Tomorrow, 110 Hawai'i at 244, 131 P.3d at 527 (citation omitted).  This case addresses two important issues regarding land use and development in the County of Hawai'i.  First, this case clarifies that certain provisions in the Kona CDP hold the force and effect of law, and must be applied when approving PUD permits.  Second, this case reaffirms existing Hawai'i case law that the Planning Director has a duty under the public trust doctrine to consider public trust resources such as water when approving permits such as the PUD permit in this case.  However, it is questionable whether the Misslers have met the purpose of the private attorney general

doctrine, which "is to promote vindication of important public rights." Sierra Club, 120 Hawaiʻi at 219, 202 P.3d at 1264. Here, the Misslers have a significant personal stake in litigating this case because they claim their property will be directly affected by the PUD permit. In their appeal to the BOA, the Misslers stated they have an interest in the PUD application because they are adjacent property owners and the PUD application proposes to use a roadway that also serves to access the Misslers' property. The Misslers also challenged the PUD application because it does not address, *inter alia*, the "impact of the proposed development on adjoining properties and roadways." It is thus unclear whether the Misslers meet the first prong of the test.

The second prong of the private attorney general doctrine requires the court to consider "the necessity for private enforcement and the magnitude of the resultant burden on the plaintiff." Maui Tomorrow, 110 Hawaiʻi at 244, 131 P.3d at 527 (citation omitted). The County cites to Waiahole II and Maui Tomorrow in asserting that the private attorney general doctrine does not apply to cases arising out of a contested case hearing.

In Waiahole II, the supreme court stated that the case appeared to meet the first and third prongs of the private attorney general doctrine test because the case involved "constitutional rights of profound significance, and all of the citizens of the state, present and future, stood to benefit from the decision." 96 Hawaiʻi at 31, 25 P.3d at 806. Additionally, the supreme court stated "[t]he public rights at issue in this case compare favorably with those considered in other cases in which the courts awarded attorneys' fees under the private attorney general doctrine." Id. However, the supreme court concluded that the second prong of the test was not satisfied, in part because the case involved a secondary appeal from a public tribunal. As explained by the supreme court:

> The Windward Parties cite no case in which attorneys' fees were awarded in an adversarial proceeding against a tribunal and the losing parties and in favor of the prevailing party,

27

> based on the reversal of the tribunal's decision on appeal. <u>Nor does such a rule appear prudent from a policy standpoint, where public tribunals in adversarial settings must invariably consider and weigh various "public interests."</u> Therefore, we hold that this case does not qualify for an award of attorneys' fees under the conventional application of the private attorney general doctrine.

<u>Id.</u> at 32, 25 P.3d at 807 (emphasis added).

In <u>Maui Tomorrow</u>, the supreme court also concluded that the second prong of the private attorney general doctrine was not satisfied. In relevant part, the court noted that <u>Maui Tomorrow</u>,

> as in <u>Waiahole II</u>, involves an appeal from the decision of a tribunal in an adversarial proceeding, and the circuit court "made no rulings regarding the ultimate disposition of water resources, but simply remanded the matter ... for further findings and conclusions." Like the Windward Parties, Na Moku cites to no cases in which fees were awarded against a tribunal and the losing parties based on the reversal of the tribunal's decision on appeal.

110 Hawai'i at 245, 131 P.3d at 528 (citation omitted).

In this case, the circuit court reversed the decision of the BOA, vacated the decision by the Planning Director, and remanded the matter to the Planning Director to consider the PUD application consistent with the Circuit Court Decision and Order. As noted by the County, the private attorney general doctrine has not been applied in a case such as this, a secondary appeal pursuant to HRS § 91-14 from a contested case. Therefore, based on our <i>de novo</i> review, we conclude the circuit court erred in determining that the second prong of the private attorney general doctrine applied. <u>See also</u> <u>Hou v. Univ. of Haw. Inst. for Astronomy</u>, No. 29032, 2011 WL 2002223, at *9-10 (Haw. App. May 24, 2011)(mem. op.) (holding that the private attorney general doctrine did not apply to a secondary appeal from a contested case proceeding).

Because the second prong of the private attorney general doctrine is not met, we need not address the third prong. <u>See</u> <u>Waiahole II</u>, 96 Hawai'i at 31, 25 P.3d at 806 (noting that the private attorney general doctrine did not apply where the

first and third prong were met, but the second prong was not); Hou, 2011 WL 2002223, at *10.

## IV. The Misslers' Appeal

In their appeal, the Misslers challenge the circuit court's award of attorney's fees and costs, asserting that the circuit court abused its discretion when it: (1) did not award them attorney's fees and costs against the Planning Director and the Applicants for the fees and costs incurred to establish the administrative record during the contested case hearing before the BOA; and (2) denied the Misslers attorney's fees and costs incurred at the circuit court against the BOA and the Applicants. The Misslers argue that they should have been awarded their requested attorney's fees and costs under the private attorney general doctrine.

In its Order Granting in Part and Denying in Part Attorney's Fees and Costs, the only basis on which the circuit court awarded attorney's fees and costs was the private attorney general doctrine. In light of our holding that the private attorney general doctrine does not apply, we conclude that the Misslers' appeal is without merit.

## V. Conclusion

The "Findings of Fact, Conclusions of Law and Decision and Order" entered on April 25, 2013, the "Order Clarifying Findings of Fact and Conclusions of Law and Decision and Order Filed April 25, 2013" entered on June 26, 2013, and the Judgment entered on June 27, 2013, by the Circuit Court of the Third Circuit, are hereby: (1) vacated to the extent the circuit court concluded that the PUD application failed to contain an "agricultural plan" under Hawai'i County Code §§ 25-6-1 and 25-6-3(3), and that the PUD permit was not valid because it did not contain specific measures requiring the project lots to be used for bona fide agricultural uses; and (2) affirmed in all other respects.

The circuit court's "Order Granting in Part and Denying in Part Appellants' Motion for Taxation of Attorney's Fees and

29

Costs [Filed May 30, 2013]," filed on July 25, 2013, is vacated to the extent that it granted attorney's fees and costs to the Misslers under the private attorney general doctrine.

The case is remanded to the Department of Planning, County of Hawai'i for proceedings consistent with this opinion.

DATED: Honolulu, Hawai'i, June 26, 2017.

On the briefs:

Amy G. Self,
Renee N.C. Schoen,
Deputies Corporation Counsel,
Office of the Corporation Counsel,
for Appellees-Appellants.

Michael J. Matsukawa,
for Appellants-Appellees.

Steven S.C. Lim,
Edmund W.K. Haitsuka,
Jacob L. Matson,
(Carlsmith Ball LLP)
for Appellees-Appellees.

Chief Judge

Associate Judge

Associate Judge